In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1380

MARK D. JENSEN,

*Petitioner-Appellee,*

*v.*

MARC CLEMENTS,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 11 CV 00803 — **William C. Griesbach**, *Chief Judge.*

ARGUED OCTOBER 30, 2014 — DECIDED SEPTEMBER 8, 2015

Before WILLIAMS, TINDER, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Julie Jensen's handwritten letter to the police was "a make or break issue," an "essential component of the State's case," and of "extraordinary value" to "the central issue in this case." Those are not the court's words, but the words of the State, as it fought for the admission of the letter before it placed Mark Jensen on trial for his

wife Julie's murder. The State maintained at trial that Jensen killed his wife and framed it to look like suicide. Jensen's defense was that his wife, depressed, and unhappy in marriage, committed suicide and made it look like her husband had killed her. A key piece of evidence at trial was Julie's handwritten letter to the police, written two weeks before her death, in which she wrote that she would never take her life and that her husband should be the suspect if anything should happen to her.

As a later-decided United States Supreme Court case, *Giles v. California*, 554 U.S. 353 (2008), made clear, this letter and other accusatory statements she made to police in the weeks before her death regarding her husband should never have been introduced at trial. The Wisconsin appellate court found the error in admission to be harmless. Jensen now seeks a writ of habeas corpus, which he may only receive if the Wisconsin appellate court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We agree with the district court that the Wisconsin appellate court's harmless error determination reflects an unreasonable application of the *Chapman v. California*, 386 U.S. 18 (1967), harmless error standard. The erroneous admission of Julie's letter and statements to the police had a substantial and injurious influence or effect in determining the jury's verdict. So we affirm the district court's grant of Jensen's petition for a writ of habeas corpus.

## I.  **BACKGROUND**

Two weeks before her death, Julie Jensen gave a sealed envelope to her neighbors, Tadeusz and Margaret Wojt, and told them that if anything happened to her, they should give the envelope to the police. The day of Julie's death, the Wojts did just that. The envelope contained a handwritten letter with Julie's signature that read:

Pleasant Prairie Police Department, Ron Kosman or Detective Ratzburg,

I took this picture [and] am writing this on Saturday 11-21-98 at 7 AM. This "list" was in my husband's business daily planner—not meant for me to see, I don't know what it means, but if anything happens to me, he would be my first suspect. Our relationship has deteriorated to the polite superficial. I know he's never forgiven me for the brief affair I had with that creep seven years ago. Mark lives for work [and] the kids; he's an avid surfer of the Internet

Anyway, I do not smoke or drink. My mother was an alcoholic, so I limit my drinking to one or two a week. Mark wants me to drink more—with him in the evenings. I don't. I would never take my life because of my kids—they are everything to me! I regularly take Tylenol [and] multi-vitamins; occasionally take OTC stuff for colds, Zantac, or Immodium; have one prescription for migraine tablets, which Mark use[s] more than I.

I pray I'm wrong [and] nothing happens … but I am suspicious of Mark's behaviors [and] fear for my early demise. However, I will not leave David [and] Douglas.

My life's greatest love, accomplishment and wish: "My
3 D's"—Daddy (Mark), David, Douglas.

Julie had made other similarly accusatory statements to
the police in the weeks before her death as well. She left two
voicemails for Officer Ron Kosman, stating in the second
that she thought her husband was trying to kill her. (She left
this message on a voicemail despite Officer Kosman's mes-
sage on his voicemail that he was out of the office on a hunt-
ing trip and would not check messages until his return.) Of-
ficer Kosman then visited Julie, and she told him she had
given a letter to the Wojts along with a roll of film with pho-
tographs she had taken of Jensen's day planner, evidently to
include the "list" in his planner referenced in her letter. She
retrieved the film and gave it to Officer Kosman, but the po-
lice were unable to connect the photographs of the pages of
Jensen's day planner to anything connected to the case. Julie
also told Officer Kosman that if she were to be found dead,
she did not commit suicide, and Jensen was her first suspect.
She made statements to others as well including the Wojts
and her son's teacher that she worried her husband was go-
ing to kill her.

Julie was found dead in the home she shared with her
husband and their two sons on December 3, 1998. The first
autopsy did not reveal a cause of death, and the case was ini-
tially treated as a suicide. A search of the Jensens' home
computer yielded internet searches for suicide and poison-
ing, including a search at 7:40 am on December 3 for "eth-
ylene glycol poisoning." Ethylene glycol, commonly known
as antifreeze, was found in Julie's system. But the toxicolo-
gist (Dr. Christopher Long)'s initial characterization was
badly off. He described the 3,940 micrograms per milliliter of

ethylene glycol in the 660 ml of her gastric contents as a "large concentration of ethylene glycol." His report reached the conclusion that Julie's death was not a suicide, and he reached this conclusion by relying on factors including that Julie's stomach contained significant amounts of ethylene glycol, showing that her death occurred at or near the time of administration; she would have been too weak to drink the amount of ethylene glycol in her stomach without assistance; and she would have been too weak to hide the ethylene glycol container after her final dose. But in reality, the 660 ml of her stomach contents contained only a half teaspoon of ethylene glycol, or .083 ounces, so it was not a "large concentration." Dr. Long's mistake destroyed the foundation of his opinion that Julie's death was not a suicide, i.e., that she could not have consumed that large a quantity of ethylene glycol on her own. The computer search also revealed numerous emails between Jensen and a woman with whom he was having an affair.

In March 2002, over three years after Julie's death, Jensen was charged with first-degree intentional homicide. Dr. Mark Chambliss, the doctor who conducted an autopsy, said at trial for the first time that the cause of death was asphyxia by smothering, and a medical examiner concluded that the cause of death was ethylene glycol poisoning with probable terminal asphyxia. From the beginning, the parties contested the admissibility of Julie's letter and her statements to Officer Kosman in the weeks before her death. The State conceded that the voicemails Julie left for Officer Kosman were inadmissible hearsay. The Wisconsin state trial court ruled that Julie's letter was admissible in its entirety. After the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), Jensen moved for reconsideration. The trial court

granted Jensen's motion for reconsideration, ruling that Ju-lie's letter and statements to Officer Kosman were testimoni-al and therefore not admissible under *Crawford* because the declarant was unable to testify at trial and there was no prior opportunity for cross examination. The court also rejected the State's argument that the letter and Julie's statements were admissible under the doctrine of forfeiture by wrong-doing.

The State appealed the trial court's order and petitioned for bypass directly to the Wisconsin Supreme Court. On Feb-ruary 23, 2007, the Wisconsin Supreme Court agreed that the letter and statements to police were testimonial, but it also ruled that the trial court erred in its analysis of whether the statements were admissible under the forfeiture by wrong-doing doctrine. *State v. Jensen*, 727 N.W.2d 518, 536-37 (Wis. 2007) ("*Jensen I*"). The Wisconsin Supreme Court adopted "a broad forfeiture by wrongdoing doctrine, and conclude[d] that if the State can prove by a preponderance of the evi-dence that the accused caused the absence of the witness, the forfeiture by wrongdoing doctrine will apply to the confron-tation rights of the defendant." *Id.* at 536. The court remand-ed for a hearing to determine the application of the doctrine in Jensen's case. *Id.* at 537.

On remand, after a ten-day hearing, the trial court found by a preponderance of the evidence that Jensen killed Julie, causing her absence from trial, and so Jensen had for-feited his right to confrontation with respect to the letter.[1] As

---

[1] There are serious reasons to question this finding, however. For ex-ample, the medical examiner Dr. Mary Mainland testified for the State during the forfeiture hearing that murder was likely, and she testified that Julie would have been too weak the day before she died to use the

a result, the letter and Julie's statements to Officer Kosman were admissible at trial.

The resulting six-week trial began more than nine years after Julie's death. The State introduced evidence concerning Julie's statements and actions in the days, weeks, and months before her death, including her handwritten letter and statements to Officer Kosman. The State also introduced evidence that Jensen was having an affair and that he was bitter about a brief affair Julie had seven years earlier. Two of Jensen's former co-workers testified that he had made in-criminating statements to them. The State contended that Jensen had made plans to murder his wife to have a future with his mistress, wanted to avoid a messy divorce, and had searched on the internet for ways to make Julie's death look like a suicide. The State also argued that Julie was a devoted mother who would not have committed suicide. The State maintained that Julie could not have ingested ethylene gly-col by herself and that Jensen had suffocated her after she showed signs of recovering from poison he had given her.

Surprisingly, this suffocation theory arose for the very first time at the trial more than nine years after Julie's death, when it came up for the first time during Dr. Chambliss's redirect examination. Dr. Chambliss had performed an au-topsy, and his report had not identified a cause of death. But during redirect examination, the prosecutor showed Dr. Chambliss photographs of Julie at the scene that appeared to show Julie with an unnaturally bent nose. The prosecutor

---

telephone. But at trial Dr. Mainland admitted that she had been "mistak-en" in her testimony during the forfeiture hearing because Julie did in fact use the phone that day and had a telephone conversation with Mrs. Wojt.

posed a hypothetical question to Dr. Chambliss. It asked him to, among other things, "consider the manner in which the face appears to be smashed into the pillow" and to consider information from Jensen's cellblock mate Aaron Dillard (whose significant credibility concerns we will discuss later) that Jensen "had shoved her face into the pillow and suffocated her." When the prosecutor asked whether Dr. Chambliss had an opinion as to the cause of death in those circumstances, Dr. Chambliss responded with the opinion, for the first time, that the immediate cause of death would be smothering. Yet the autopsy report did not report any damage to Julie's nose, and witnesses at the scene had not observed anything unusual about her nose. As for Dr. Mainland, she had testified at the forfeiture hearing that Julie died from ethylene-glycol poisoning. Then five months later, at trial, she too testified that Julie had been suffocated, based on details from Dillard.

The defense account at trial was much different. It took the position that Julie, depressed, had committed suicide by poisoning herself but had made it look as though her husband, from whom she was distant, had killed her. The defense maintained that Julie was discouraging others from worrying about her absence so they would not come to her assistance. Julie had not been restrained or otherwise incapacitated from seeking help, and ethylene glycol was a fairly slow-acting poison, so the defense contended that Julie's failure to seek help was more consistent with suicide than with murder.

The defense evidence included testimony from the Jensens' family doctor, who told the jury that during an appointment two days before her death, Julie "seemed de-

pressed and distraught and almost frantic, actually." The jury heard Julie had a fifteen-minute conversation with her neighbor, Mrs. Wojt, the day before her death in which she told Mrs. Wojt not to worry if she did not see Julie outside that day because she was not feeling well due to her medication. Julie also made a similar statement to her sister-in-law three days earlier that she would be ill on December 2 because she expected to be put on medication by her doctor. The defense also highlighted that although Julie had made multiple statements saying she feared her husband was trying to kill her, she did not call anyone or otherwise seek help when she began to feel ill.

After thirty hours of deliberation, the jury convicted Jensen of first-degree intentional homicide. Four months later, the United States Supreme Court decided *Giles v. California*, 554 U.S. 353 (2008), which adopted a narrower interpretation of the Confrontation Clause than had the Wisconsin Supreme Court in *Jensen I.* On the direct appeal of his conviction, Jensen argued that *Giles* made clear that Julie's handwritten letter and statements to the police were erroneously admitted.

In a December 29, 2010 ruling, the Wisconsin Appellate Court "assume[d] that the disputed testimonial evidence was erroneously admitted" in light of *Giles* but found that any error was harmless, and it affirmed Jensen's conviction. *State v. Jensen*, 794 N.W.2d 482, 493 (Wis. App. Ct. 2010) ("*Jensen II*"). The Wisconsin Supreme Court denied Jensen's petition for review. Jensen then filed a petition for a writ of habeas corpus in federal district court. The district court granted Jensen's petition, and the warden appeals.

## II. ANALYSIS

Jensen's habeas petition is premised on his contention that the admission of Julie's handwritten letter and her accusatory statements to the police in the weeks before her death violated his right to confrontation under the Sixth Amendment to the United States Constitution. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." Ordinarily, a witness who makes testimonial statements against a defendant will be available at trial for cross examination, and if not available then the witness's earlier testimony will only be introduced at trial if the defendant had an earlier opportunity to cross examine the witness. *See Crawford*, 541 U.S. at 68.

The state trial court concluded that an exception to the right of confrontation was present here because Jensen had committed a wrongful act (murder) that made the witness unavailable to testify at trial. But the Supreme Court subsequently held in *Giles* that the forfeiture by wrongdoing exception to the Confrontation Clause in the United States Constitution applies only when the defendant engaged in conduct designed to prevent the witness from testifying. *Giles*, 554 U.S. at 359; *see also id.* at 367 ("Every commentator we are aware of has concluded the requirement of intent 'means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable.'") (citation omitted). In other words, testimonial hearsay statements for which no other exception applies should be excluded if "the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical

murder cases involving accusatorial statements by the victim." *Id.* at 361. The warden makes no argument that the letter and statements were admissible under *Giles*. Indeed, the State's theory at trial was that Jensen killed his wife not to prevent her from testifying, but because he wanted her dead. Under *Giles*, the admission of Julie's letter and statements to the police, none of which were dying declarations, violated the Confrontation Clause and was federal Constitutional error. The warden does, however, argue that Jensen cannot benefit from *Giles* as a procedural matter, and we turn to that argument now.

## A. *Giles* Decided Before Claim Adjudicated on the Merits by State Court

The parties dispute which Wisconsin state court decision constitutes the relevant decision for Antiterrorism and Effective Death Penalty Act of 1986 ("AEDPA") purposes. Under AEDPA, habeas relief

shall not be granted with respect to *any claim that was adjudicated on the merits* in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) (emphasis added). Jensen argues that the Wisconsin appellate court's post-*Giles* decision is the last state-court decision adjudicating his claim on the merits, and

he maintains our review under AEDPA is therefore of the state appellate court decision.

The warden, however, argues that the last state court adjudication of the merits of Jensen's Confrontation Clause claim was the trial court's 2007 decision concluding that the disputed evidence was admissible under the forfeiture by wrongdoing exception. Because the Supreme Court did not decide *Giles* until 2008, the warden contends there is no decision contrary to clearly established Supreme Court case law at the time, and so Jensen's petition for habeas relief fails. The state appellate court assumed that the disputed testimonial evidence was erroneously admitted under *Giles* but found that any error was harmless, and the warden maintains the state appellate court did not adjudicate the claim "on the merits" because the decision was made on harmlesserror grounds. *Jensen II*, 794 N.W.2d at 493.

If the warden is correct that the trial court decision is the relevant decision in this case, Jensen's habeas request fails because it is premised on *Giles*, which the Supreme Court had not decided at the time of the trial court ruling. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (measuring statecourt decisions against the Supreme Court precedents as of the time the state court renders its decision); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (stating it is not an unreasonable application of clearly established federal law "for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.").

The United States Supreme Court's recent decision in *Davis v. Ayala*, 135 S. Ct. 2187 (2015), guides us here. There, neither the criminal defendant nor his lawyer was given the opportunity to be present during the hearings on his chal-

lenges to the prosecutor's use of peremptory challenges to exclude minority jurors, and he maintained that the *ex parte* hearings violated his federal Constitutional rights. *Id.* at 2194-95. The California Supreme Court ruled that any error was harmless beyond a reasonable doubt. *Id.* at 2195 (citing *People v. Ayala*, 6 P.3d 193, 204 (Cal. 2000)). The United States Supreme Court granted a petition for a writ of certiorari, and one of the questions was "[w]hether a state court's rejection of a claim of federal constitutional error on the ground that any error, if one occurred, was harmless beyond a reasonable doubt is an 'adjudicat[ion] on the merits' within the meaning of 28 U.S.C. § 2254(d), so that a federal court may set aside the resulting final state conviction only if the defendant can satisfy the restrictive standards imposed by that provision." Brief for Petitioner at i, *Chappell v. Ayala*, 135 S. Ct. 401 (2014) (No. 13-1428), 2014 WL 2335007, at *i; *see Chappell v. Ayala*, 135 S. Ct. 401 (Oct. 20, 2014) (granting petition for writ of certiorari).

In its resulting decision, the Court stated that "[t]here is no dispute that the California Supreme Court held that any federal error was harmless beyond a reasonable doubt under *Chapman* [*v. California*, 386 U.S. 18 (1967)]." *Ayala*, 135 S. Ct. at 2198. The Court then ruled that "this decision undoubtedly constitutes an adjudication of Ayala's constitutional claim 'on the merits.'" *Id.*

That a state court holding of harmless error beyond a reasonable doubt constitutes the adjudication of a claim on the merits for AEDPA purposes makes sense. The Court has previously explained that "as used in this context, the word 'merits' is defined as *'[t]he intrinsic rights and wrongs of a case* as determined by matters of substance, in distinction from

matters of form." *Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) (quoting Webster's New International Dictionary 540 (2d ed. 1954)). In contrast, an adjudication on matters "extraneous" to the particular claim, "such as competence of the tribunal or the like," or on "procedural details" or "technicalities," would not be a decision "on the merits." *Id.* A harmless-error determination is a substantive determination, not merely one of form.

In his brief written before *Ayala*, the warden pointed to *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011). In *Greene*, the parties agreed that the last state court adjudication on the merits of a federal Confrontation Clause claim took place on direct appeal to the Pennsylvania Superior Court. *Id.* at 45. The United States Supreme Court decision on which the defendant wished to rely, *Gray v. Maryland*, 523 U.S. 185 (1998), did not issue until three months later. The *Greene* Court ruled that although *Gray* was issued while the defendant's petition for leave to appeal to the Pennsylvania Supreme Court was pending, and that court initially granted the petition (though later dismissed it as improvidently granted), *Gray* was not "clearly established Federal law" under AEDPA because it had not been issued at the time of the last state-court adjudication on the merits. *Id.* No harmless-error determination was at issue in *Greene*, and *Greene* does not inform the analysis of whether a harmless-error determination is an adjudication on the merits.

Under *Ayala*, though, it is clear that the Wisconsin appellate court decision is the last "adjudication on the merits" for AEDPA purposes in Jensen's case. Therefore, *Giles* had been decided by the time of the last adjudication of the claim on the merits, and Julie's letter and the statements to Officer

Kosman at issue were admitted in violation of Jensen's rights under the United States Constitution, as shown by clearly established Supreme Court precedent at the time of the Wisconsin appellate court decision.

### B. Error Had Substantial and Injurious Effect in Determining Jury's Verdict

We must now assess whether the Wisconsin appellate court's decision that any federal constitutional error was harmless was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2). Jensen maintains it was, and the district court agreed.

"The test for whether a federal constitutional error was harmless depends on the procedural posture of the case." *Ayala*, 135 S. Ct. at 2197. When a case is on direct appeal, the standard for harmless error is that articulated in *Chapman*: "'[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'" *Ayala*, 135 S. Ct. at 2197 (quoting *Chapman*, 386 U.S. at 24).

However, because the conviction here originated in state court, this case is a collateral proceeding governed by AEDPA. Our case law had given some contrary signals as to the applicability of the Supreme Court's decisions in *Chapman* and *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in cases where the state-court ruling was based on harmless error. *Compare, e.g., Kamlager v. Pollard*, 715 F.3d 1010, 1016 (7th Cir. 2013) and *Brown v. Rednour*, 637 F.3d 761, 766 (7th Cir. 2011) *with, e.g., Jones v. Basinger*, 635 F.3d 1030, 1052 n.8 (7th Cir.

2011) (recognizing that "any error sufficiently harmful to satisfy the *Brecht* 'actual prejudice' standard could be deemed harmless only by unreasonably applying *Chapman*.").

The Supreme Court's recent decision in *Ayala* clarified the standard of review. For habeas petitioners like Jensen, where the state court ruled that an error in admission was a harmless error, the petitioners are

> "not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).

*Ayala*, 135 S. Ct. at 2197-98.

So the Supreme Court has made clear that Jensen must meet the *Brecht* standard. But *Ayala* also makes clear that this requirement does not mean that the Wisconsin appellate court's harmless error determination lacks significance. *See Ayala*, 135 S. Ct. at 2198. Rather, the "*Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* (citing *Fry v. Pliler*, 551 U.S. 112, 120 (2007)). While a federal court adjudicating a habeas petition does not need to "'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'" *Ayala*, 135 S. Ct. at 2198.

Jensen maintains that the *Brecht* standard is satisfied here and that the Wisconsin court's finding that the error was harmless beyond a reasonable doubt was not just wrong, but also unreasonable. *Cf. Ayala*, 135 S. Ct. at 2199 (stating that when reviewing state court's determination that error was harmless under *Chapman*, federal court cannot grant habeas relief unless harmlessness determination itself was unreasonable). He also argues that the Wisconsin court unreasonably applied clearly established Supreme Court law by applying the wrong test, failing to consider his evidence in defense, and erroneously determining that key points of evidence were undisputed.

We begin with the test for harmless error. Time and again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict. Nearly seventy years ago, in *Kotteakos v. United States*, 328 U.S. 750 (1946), the Supreme Court explained as it conducted harmless-error review of jury's decision:

> And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had on the jury's decision.…The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Id.* at 764-65. The Supreme Court has reinforced this principle over and over. For example, in *Satterwhite v. Texas*, 486 U.S. 249 (1988), the Court considered a death sentence where the state appellate court found contested testimony harmless

on the basis that the properly admitted evidence would have been sufficient to support a jury decision. *Id.* at 258. The Supreme Court reversed, explaining, "[t]he question, however, is not whether the legally admitted evidence was sufficient to support the death sentence, which we assume it was, but rather whether the State has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 258-59 (quoting *Chapman*, 386 U.S. at 24). Finding this standard satisfied, the Court reversed the state court's judgment. *Id.* at 260; *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."); *Fahy v. State of Conn.*, 375 U.S. 85, 86 (1963) ("We find that the erroneous admission of this unconstitutionally obtained evidence at this petitioner's trial was prejudicial; therefore, the error was not harmless, and the conviction must be reversed. We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of.").

Despite this long line of cases establishing the test for harmless error, the Wisconsin appellate court's reasoning reads as though it is conducting an evaluation of whether there was sufficient evidence to support the verdict, not whether the error in admitting Julie's letter and statements to police affected the jury's verdict. *Cf. Kotteakos*, 328 U.S. at 764-65. Near the beginning of its analysis, the state appellate court stated, "Here, we will not attempt to catalog all the untainted evidence the State presented; however, we will summarize some of the compelling pieces in order to illus-

trate that the record is replete with reason to uphold the jury's verdict, even if the assumedly tainted evidence is disregarded." *Jensen II*, 794 N.W.2d at 493. The court then went through five categories of evidence presented by the State— computer evidence, motive evidence, Jensen's incriminating statements, medical evidence, and miscellaneous evidence. *Id.* at 493-94. The court said this was evidence from which "a rational jury could alone conclude beyond a reasonable doubt" that Jensen murdered his wife. *Id.* at 494. But a statement of what a "rational jury could conclude" is not a statement of a harmless-error inquiry; it is instead the question presented when a direct appeal asks whether there is sufficient evidence to support a verdict. *See State v. Kimbrough*, 630 N.W.2d 752, 756 (Wis. 2001). That is not the question here.

The state appellate court next said it would examine the admitted testimonial evidence to determine whether any error in admitting it was harmless. *Id.* at 495. It looked at Julie's letter and found other properly admitted evidence in the record that the appellate court said made similar points as to those made in the letter, or to corroborate statements in the letter. For example, the court stated that a sentence in Julie's letter stating that "if anything happens to me, he would be my first suspect" was assumed inadmissible evidence. It then discussed what it termed "[ad]missible duplicative/corroborative evidence in the record." *Id.* at 495. The court pointed to Mr. Wojt's testimony that about a month before her death, Julie told him she suspected Jensen was trying to poison her or drive her nuts to take the children from her. *Id.* at 496. Mr. Wojt also recounted that Julie said Jensen would go to work and leave his computer on with a screen displaying a website about poisoning. *Id.* The court

also pointed to her son's teacher's testimony recounting Julie's statement, "I think my husband is going to kill me" as well as Jensen's sister's testimony that Julie told her in the fall of 1998 that she thought Jensen might be planning to kill her. *Id.*

The court concluded its discussion comparing the individual statements in the letter to other evidence in the record by stating, "The State's additional evidence, compared to Julie's letter, illustrates that virtually all relevant information in Julie's letter was duplicated by admissible nontestimonial evidence from other sources. The rest of the record reflects that the jury heard overwhelming evidence of murder, and upon this record, it could rationally have concluded beyond a reasonable doubt that Jensen murdered Julie. The same is true regarding Julie's testimonial statements to Kosman; that is, virtually everything related in Julie's statements to Kosman was duplicated by admissible evidence from other sources." *Jensen II*, 794 N.W.2d at 498. This analysis from the Wisconsin appellate court demonstrates that it is conducting a review for whether there is sufficient evidence to support a verdict, a review that looks at all the evidence in the light most favorable to the conviction, and where the inquiry is only whether the jury could have convicted. *See Kimbrough*, 630 N.W.2d at 756. That is very different than the harmless error test under clearly established Supreme Court law.

And these statements do not just seem to be slips of the pen. The state appellate court decision contains a very detailed discussion of the State's evidence. But its discussion does not engage with the defense evidence that goes against the evidence discussed by the court. The Supreme Court has said, however, that when a court "evaluat[es] the strength of

only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006).

To be clear, if the question was whether there was sufficient evidence to convict Jensen, the answer would be "yes." But the harmless error test does not focus just on the sufficiency of other evidence. The question as we conduct the *Brecht* analysis is whether we are in "'grave doubt about whether a trial error of federal law had "substantial and injurious *effect or influence in determining the jury's verdict.*"'" *Ayala*, 135 S. Ct. at 2198 (quoting *O'Neal*, 513 U.S. at 436 (emphasis added)). So we must look at the influence the improperly admitted handwritten letter and accusatory statements to the police had on the verdict. In this analysis "we look to 'a host of factors,' such as 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Jones*, 635 F.3d at 1052 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

The letter, a handwritten letter, penned just two weeks before her death, was unlike anything else in evidence. It came straight from Julie, shortly before her death. (At least according to the State—there was some question at trial as to its authenticity.) And it played a key role in the trial from the outset. The jury first heard about the letter early in the State's opening statement, when it read the letter in its entirety out loud for the jury to hear. The State used Julie's

own words from the letter and her statements to Officer Kosman in its opening statement to underscore its themes of fear, motive, and absence of intent to take her own life. In light of the pretrial ruling that the letter would be allowed into evidence, the defense addressed the letter in its opening as well, even presenting it as a large exhibit. Defense counsel accurately in its opening statement told the jury that "[w]e'll come back to the letter many times during this case, and you'll have to decide whether it's a blueprint for framing her husband or legitimate."

The letter was also the last thing the State left in the jury's mind before it deliberated Jensen's fate, as the State's end to its rebuttal closing argument focused on the letter. (It had also highlighted the letter and Julie's statements to the police in other parts of its closing argument.) In its final arguments to the jury the State stressed that the letter contained Julie's own thoughts: "So here was her unexpressed thoughts. She wrote them down, and she hid them away …. Hid them away until a time when she could resolve this terrible dilemma she was in …."  The State also emphasized here that the jury should believe the letter because it contained Julie's own words: "It was a thought which was only to be expressed upon her death, because she wanted the world to know the truth. She wanted you to know the truth." The State told the jury to believe the letter because Julie would not have lied: "At the time she wrote those words Julie had no motive to lie. She was hoping and she was praying nobody would ever see these words." The State, in its final words, left the jury with words from the letter: "She hoped, she prayed that would not happen. But as she indicated, however, I will not leave David and Douglas, my life's greatest love, accomplishment and wish. That's why

she stayed. Dr. Spiro doesn't understand that. Well, there's a lot of things that Dr. Spiro doesn't understand. The important thing is that you do. Thank you."

The prosecution's choice to end its closing arguments with the letter reflects its importance in the prosecution's case. The letter was a unique piece of evidence. No other piece of evidence had the emotional and dramatic impact as did this "letter from the grave." While some of the statements in the letter also came out through other witnesses at trial, only the letter contained words straight from Julie. And what words they were. Julie's handwritten letter said her husband would be her first suspect if anything were to happen to her, along with emotionally compelling statements that she would never take her life or leave her children. The themes in the letter that Julie identified—she was caught up in an unhappy marriage, Jensen was still bitter about her affair, it was just Jensen who used the internet, she would never take her life because she loved her children too much, she feared Jensen was plotting her murder—were the same themes that the State developed throughout trial. *Cf. United States v. Brown*, 490 F.2d 758, 781 (D.C. Cir. 1973) ("The statement presented all the classic hearsay dangers and abuses. Here was that voice from the grave casting an incriminating shadow on the defendant … The damaging evidence stands impregnable—irretrievably lodged in the jurors' minds.").

Recognizing the significance of the letter, the prosecutor did not merely ask one witness to discuss the letter's contents; rather, it displayed the handwritten letter itself on the screen and asked the jury to read it. Twelve witnesses testified about the letter, including five experts. Notably, state

medical experts Dr. Mainland and Dr. Long relied on the letter to support their medical opinions that Julie's death was a homicide. Dr. Long testified that the letter and Julie's other statements to police regarding fearing for her life from her husband were two of the reasons for his conclusion that Julie's death was a homicide. And Dr. Mainland testified that "every sentence in the letter influenced" her, and that the sentence in the letter that Julie would not take her own life because of her children was especially influential in her opinion that the death was a homicide. The police and the Wojts also testified about the letter. The letter was also shown to Jensen during a video-recorded interrogation, and the State emphasized Jensen's reaction to the letter in its closing. The letter also came up during the jury deliberations—the jury's second note in its thirty hours of deliberations requested the letter.

Indeed, the importance of the letter in the State's case was emphasized over and over by the State as it repeatedly fought to get the letter admitted. In pretrial litigation, the State called the letter an "essential component of the State's case," "highly relevant to the central issues of this case: suicide, motive, and fear," and of "extraordinary value." It also called the letter's admissibility "a make or break issue" from the State's perspective. While the Wisconsin appellate court found the improperly admitted evidence added "nothing significant beyond the properly admitted nontestimonial statements," *Jensen II*, 794 N.W.2d at 499, in addition to all that we discussed, the State's own words reflect the importance of the letter to its case and the unreasonable nature of the appellate court's finding of harmless error.

In assessing whether the improperly admitted evidence had a substantial and injurious effect on the verdict, we are concerned with the overall strength of the prosecution's case, not merely the evidence in its favor. *Jones*, 635 F.3d at 1032. Although the state appellate court discussed the State's evidence at length, it did not engage with the defense evidence. As the district court observed, "A reader of the court of appeals' opinion would conclude that Jensen called no witnesses, introduced no evidence, never questioned the credibility of any witness, and never even elicited helpful testimony from a prosecution witness." But that is far from what actually happened during the six-week trial.

While the Wisconsin appellate court referred to "untainted and undisputed gripping evidence against Jensen," *Jensen II*, 794 N.W.2d at 494, the "undisputed" evidence in the case was all circumstantial and subject to more than one interpretation. Even the computer evidence, which the appellate court called the most incriminating evidence against Jensen, was not conclusive. The State presented evidence of searches for various means of death (poisoning, botulism, pipe bombs, and mercury fulminate, and one visited website explained how to reverse the polarity of a swimming pool, which the Jensens had), testimony from her son's teacher that Julie and her son had both said Julie did not know how to use a computer, and testimony that there was no internet use on the home computer in November 1998 from Monday through Friday between 9 a.m. and 6 p.m., while Jensen was at work, nor was there internet use during days when he was at a conference out of town.

But no evidence precluded a jury from finding that Julie did at least some of the internet searches, including those for

ethylene glycol poisoning. In addition to the pro-prosecution evidence discussed by the appellate court, the jury also heard from Julie's best friend, who testified that Julie used the computer to conduct research and for household bookkeeping. Julie's resume stated that she had performed "on-line security order entry" while working at Dean Witter. She had also obtained a Series Seven broker's license that allowed her to place and accept stock trades. That evidence was consistent with Jensen's statement to investigators denying any knowledge of the internet searches for poison and stating that Julie also used the internet and accessed the computer. Moreover, that the home computer's internet search history was deleted is equally consistent with both Julie trying to hide evidence of her suicide and with Jensen trying to hide evidence of murder. And no searches for poisons were found on Jensen's work computer, which one might have expected if he were the person doing that search on the home computer.

This case was no slam dunk. The evidence was all circumstantial. And there was significant evidence in support of Jensen's theory that Julie had taken her life, evidence not discussed at all by the Wisconsin appellate court. For example, she had visited her doctor, Dr. Richard Borman, two days before her death. Dr. Borman testified that she was "highly upset" and "seemed depressed and distraught and almost frantic, actually." The jury heard that Dr. Borman prescribed the anti-depressant Paxil, which can worsen a depressed person's symptoms. Julie became ill the day after she saw Dr. Borman, starting in the early hours of the day, and by mid-morning Jensen had gone to see Dr. Borman. Jensen expressed concern that Julie was suffering from Paxil's side effects including sleeplessness, and Dr. Borman pre-

scribed a sleep aid. It was while Jensen was away seeing Dr. Borman that Julie phoned Mrs. Wojt to say not to worry if she did not see Julie outside that day, another significant piece of evidence that supported the defense's suicide theory. A jury could infer that once Jensen left for the doctor, Julie put her suicide plan into action, including calling Mrs. Wojt and going on the computer to search for ethylene glycol poisoning. (There was an internet search for ethylene glycol poisoning at 9:45 am that day, when the defense said Jensen was away seeing Dr. Borman.)

Nor did the state appellate court discuss the significant credibility problems of seven-time convict Aaron Dillard, Jensen's one-time cellblock mate whom the trial judge called the "top liar I've ever had in court." Dillard, testifying at trial while awaiting his own sentencing, testified that Jensen admitted to him in prison that he had poisoned Julie and later suffocated her by pushing her face into a pillow. The medical professionals who opined for the very first time at trial that Julie was suffocated (Dr. Chambliss and Dr. Mainland) relied on Dillard's account for the suffocation details. Dillard had in his cell a transcript of the lead detective's interrogation of Jensen, and the trial judge recognized there was testimony from which the jury could conclude that Dillard was in and out of Jensen's cell. Although the State argued that Jensen had confessed to his cellblock mate Dillard, if the transcript was in Jensen's cell, that could have been the way Dillard obtained the details.

The state appellate court also did not discuss the testimony of Dr. Herzl Spiro, who examined Julie's mental health records and interviewed persons close to her. He testified that Julie was suffering from a major depressive disor-

der that was complicated by anxiety and agitation with possible delusional features, and he concluded that she posed a significant suicide risk and that it was more likely that Julie's ingestion of antifreeze was the result of suicidal intent rather than homicide or accident.

The state appellate court noted the testimony from Edward Klug who said that during a late-night gripe session with Jensen about their wives, Jensen said that if one wanted to get rid of his wife, there were websites instructing how to kill her with undetectable poison. But the court did not discuss the fact that Klug had not come forward with this account until nine years after Julie's death, despite the large amount of publicity surrounding the case. The state appellate court was concerned only with the evidence in the prosecution's favor, while the proper concern is with the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684; *Jones*, 635 F.3d at 1032.[2]

---

[2] The dissent suggests that it is somehow irrelevant that the Wisconsin appellate court's lengthy opinion ignored extensive evidence. But in *Harrington v. Richter*, 562 U.S. 86 (2011), to which the dissent points, there was *no* state court opinion that explained the reasons for denying relief. *Id.* at 98. Here, however, the state court gave a detailed account of the "arguments or theories [that] supported … the state court's decision," and that account matters to our analysis. *Id.* at 102; *see Brady v. Pfister*, 711 F.3d 818, 826 (7th Cir. 2013) (explaining that even after *Richter*, federal courts must evaluate whether § 2254(d) satisfied in light of state court's explanation); *cf. Kubsch v. Neal*, 2015 WL 4747942, at *17-19 (7th Cir. Aug. 12, 2015) (discussing review where state court rationale is incomplete). The actual arguments and theories supporting the state appellate court's decision convince us that its error was "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

We conclude that after consideration of the correct standard of review, the improperly admitted letter and accusatory statements resulted in actual prejudice to Jensen. We recognize that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86 (2011). But the state appellate court's ruling was not simply incorrect. The state trial judge recognized this when he called the letter's admittance "grave constitutional error" when he foresaw the *Giles* ruling. That the jury improperly heard Julie's voice from the grave in the way it did means there is no doubt that Jensen's rights under the federal Confrontation Clause were violated. Any reasonable jurist using the proper standard would have to find "grave doubt" about whether that violation is harmless. The error in admission had a substantial and injurious effect or influence in determining the jury's verdict; it was one "well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Because Jensen satisfies the *Brecht* standard, he necessarily satisfies the AEDPA standard of an unreasonable application of the *Chapman* harmless error standard. *See Ayala*, 135 S. Ct. at 138; *Fry*, 551 U.S. at 120. As a result, we agree with the district court that Jensen's petition must be granted.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.

TINDER, *Circuit Judge*, dissenting. The admission of Julie's letter and testimonial statements to Officer Kosman violated Jensen's confrontation rights, but the Wisconsin Court of Appeals affirmed his conviction, holding that the error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18, 24 (1967). Fairminded jurists could disagree with that holding. Indeed, my colleagues in the majority, who epitomize fair-mindedness, disagree, and make a strong case for doing so. But I submit that fairminded jurists could also agree with the Wisconsin Court of Appeals. And because we owe great deference to the state court's decision, we are not in a position to choose between two fairminded alternatives. I would uphold the decision of the Wisconsin Court of Appeals as a reasonable application of *Chapman*. Therefore, I respectfully dissent.

In *Brecht v. Abrahamson*, 507 U.S. 619 (1993), the Supreme Court established the harmless-error standard that applies "in determining whether habeas relief must be granted because of constitutional error of the trial type." *Id*. at 638. The test is "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quotation omitted). In other words, there must be "actual prejudice." *Id.* (quotation omitted).

> Three years after [the Court] decided *Brecht*, Congress passed, and the President signed, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), under which a habeas petition may not be granted unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

> determined by the Supreme Court of the Unit-
> ed States ....″

*Fry v. Pliler*, 551 U.S. 112, 119 (2007) (quoting 28 U.S.C. § 2254(d)(1)).

The Court recently held that when a state prisoner "seeks federal habeas corpus relief, he must meet the *Brecht* stand-ard, but that does not mean … that a state court's harmless-ness determination has no significance under *Brecht*." *Davis v. Ayala*, 135 S.Ct. 2187, 2198 (2015). Rather, "[w]hen a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harm-lessness determination itself* was unreasonable.'" *Id.* at 2199 (quoting *Fry*, 551 U.S. at 119). "And a state-court decision is not unreasonable if 'fairminded jurists could disagree on [its] correctness.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)) (internal quotation marks omitted). Thus, to prevail, a petitioner "must show that the state court's deci-sion to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disa-greement.'" *Id.* (quoting *Richter*, 562 U.S. at 103).

As assumed by the Wisconsin Court of Appeals, the ad-mission of Julie's letter and testimonial statements to Officer Kosman violated the Confrontation Clause. However, to ob-tain habeas relief, Jensen "must show that he was actually prejudiced by this [violation], a standard that he necessarily cannot satisfy if a fairminded jurist could agree with the [state court's] decision that the [violation] met the *Chapman* standard of harmlessness." *Id*.

The Wisconsin Court of Appeals examined Julie's letter line by line, and it explained in great detail how all of Julie's statements in the letter were duplicative of other, admissible evidence. *State v. Jensen (Jensen II)*, 794 N.W.2d 482, 495–98 (2010). It did the same with Julie's testimonial statements to Officer Kosman. *Id.* at 498–99. For example, Jensen's sister, Laura Koster, testified that Julie told her that she thought Jensen might be planning to kill her. Koster also testified that Julie showed her a photo of a list from Jensen's day planner and something that "looked like a syringe."

Tadeusz Wojt, Julie's neighbor, testified that during the three weeks prior to Julie's death, Julie was upset and "scared she was go[ing] to die," because Julie feared that Jensen was trying to poison her by "put[ting] something in the wine" Jensen insisted Julie drink. Wojt also testified that Julie told him that she did not think she would make it through one particular weekend because she had found suspicious notes written by her husband and she had seen a computer page about poisoning that Jensen had left open on the home computer. Wojt testified that Julie repeatedly told him about marital problems she and Jensen were having.

Therese DeFazio, Julie's son's teacher, testified that a week before her death, Julie told DeFazio that she thought Jensen was trying to kill her and "was going to make it look like a suicide." DeFazio said Julie told her about a list written by Jensen that included "syringes ... and drugs and items like that," and Julie feared that Jensen was going to try to give her an overdose of drugs by putting them in her food or drink. DeFazio testified that Julie said that Jensen "never forgave her" for the affair she had eight years earlier. DeFazio also testified that in August 1998 she asked Julie to help

in the computer lab with the children, and Julie said, "[O]h, I can't do that, I don't even know how to turn one on." DeFazio testified that Julie's son told DeFazio that he was teaching his mother how to use a computer because "she didn't know how." DeFazio testified that Julie said she gave her neighbor a note, "saying that if my husband ever kills me please believe that I did not commit suicide, I would never do that because I love my children and I wouldn't do that to my children."

Dr. Richard Borman, Julie's physician, testified that two days before her death, Julie denied being suicidal and said she loved her children "more than anything and they were the most important thing in the world to her," and she did not want to lose them. Dr. Borman said Julie alluded to an affair that she had in the past and said she believed that Jensen had "never really forgiven" her for it.

Jensen's friend and co-worker, David Nehring, testified that soon after he met Jensen, sometime around 1990 or 1991, Jensen told him about Julie's brief affair. Nehring testified that eight years after telling him about the affair, Jensen's anger had not diminished. He said that "[Jensen] remained upset about [the affair] and distressed over it for as long as I knew him." Nehring described Jensen's computer skills as "above average," and testified that during the month before Julie's death, Jensen conducted Internet searches on drug interactions "on a very frequent basis." Nehring testified that Jensen said he was trying to get Julie to relax by offering her glasses of wine at night, but she was resisting his efforts. Nehring also testified that a day after Nehring told Jensen he was surprised the police had not seized Jensen's work computer as part of the investigation into Julie's death, Jensen

reported that his work computer "had been fried and he'd have to get a new one."

The State presented evidence indicating that Jensen repeatedly placed pornographic photos around the house for Julie to find and that Jensen knew Julie believed her former paramour was planting them. Jensen denied knowing the origin of the pornographic photos, but he told the investigating officer, Detective Paul Ratzburg, that he began saving the photos and using them to upset Julie when "something would happen" that caused him to "get pissed off." Detective Ratzburg said Jensen explained that sometimes Jensen would leave the photos out for Julie to find and other times he would bring them out, show them to Julie and tell her that he "found these in the shed." Detective Ratzburg testified that Jensen admitted that their marriage was never the same after Julie's affair.

Detective Ratzburg also testified that Jensen told him that on the morning of Julie's death, Julie "could hardly sit up," she "was not able to get out of bed," and she "was not able to move around and function." Jensen said he propped Julie up in bed at 7:30 a.m., and he did not leave home that morning until 8:00 or 9:00 a.m. This timetable is significant because of computer evidence that, at 7:40 a.m. on the day of Julie's death, a search for "ethylene glycol poisoning" was conducted on the Jensen home computer and then the user double-deleted that morning's Internet history. Computer evidence also revealed that, two months earlier, the Jensen home computer was used to search for methods of poisoning on the same day Jensen and his then-paramour exchanged emails planning their future together.

In short, there were multiple sources of admissible evidence duplicating (or corroborating) every relevant aspect of Julie's erroneously admitted testimonial statements. In particular, Julie's letter and statements to Officer Kosman were not the only times Julie told her story; during the same time period, she told variations of the same story to multiple people. This contributed to what the Wisconsin Court of Appeals described as "the staggering weight of the untainted evidence and cumulatively sound evidence presented by the State," which led the court to conclude that "the State has proven beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained." *Jensen II*, 794 N.W.2d at 504.

The Wisconsin Court of Appeals recognized that "[t]his case was not a classic whodunit." *Id.* at 493. Instead, the jury was asked to choose between two dark and premeditated alternatives—either Jensen murdered Julie and framed it to look like suicide, or Julie committed suicide and framed Jensen for murder. One unique aspect of this case is that each of Julie's testimonial statements, as well as much of the duplicative admissible evidence, could be interpreted to support either alternative. (Given the wealth of duplicative admissible evidence, it seems safe to assume the jury will be presented with the same stark choice if there is a retrial.) It reasonably could be said that the inclusion or exclusion of Julie's letter and testimonial statements to Officer Kosman would not significantly alter the jury's choice or the considerations underlying that choice, no matter the rhetoric employed by the State's lawyers in pretrial filings or the parties' use of the letter as a framing device during trial.

In part because so much of the evidence could be viewed as supporting either of the two competing theories, the prosecution's case was not a slam dunk, as discussed by the majority. And as also noted by the majority, there might be reason to believe that Julie's letter was especially forceful evidence (even though its authenticity was questioned) and that members of the jury would have given less weight to Julie's oft-repeated fears and accusations if all they had were her oral statements to her neighbor, her son's teacher, and Jensen's sister, as well as the corroborating computer and medical evidence, evidence of Jensen's incriminating statements and motive, and evidence of Julie's lack of suicidal intent and devotion to her children. But it might also be reasonable to think that without the letter and testimonial statements to Officer Kosman, the jury would have been less inclined to believe Jensen's theory that Julie committed suicide and framed him for murder, because anyone concocting such a scheme likely would have memorialized their accusations in writing and taken steps to ensure they came to the attention of the police. In other words, in this unique situation—where the evidence at issue supported each side's theory—the state court could reasonably decide that despite the significant role Julie's testimonial statements played in the trial, those statements did not play a significant role in deciding the jury's verdict.

The majority faults the Wisconsin Court of Appeals for ignoring evidence supporting the defense theory. It is worth pointing out that the Wisconsin court stated that it "review[ed] the extensive record." *Jensen II*, 794 N.W.2d at 504. But "of greater moment is the Supreme Court's ruling in *Harrington* [*v. Richter*] that even a state court 'opinion' consisting of the single word 'affirmed' is entitled to the full

deference that the habeas corpus statute demands be given determinations by state courts. The Supreme Court's ruling precludes our inferring error from the Wisconsin court's failure to discuss particular pieces of evidence." *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011) (citing *Richter*, 562 U.S. at 98–99).

The majority reads the Wisconsin Court of Appeals's decision as employing a sufficiency-of-the-evidence test, rather than a harmlessness test. If that was true, it would be an unreasonable application of *Chapman*, and to be fair, there are a few statements in the state court's opinion to support this reading. But in each case, the court reiterated its finding of harmlessness based on "the staggering weight of the untainted evidence and cumulatively sound evidence presented by the State." *Jensen II*, 794 N.W.2d at 504. For example, after cataloging some of the state's corroborating evidence, the court stated:

> With the above illustrative summary of the other, untainted and undisputed gripping evidence against Jensen—from which a rational jury could alone conclude beyond a reasonable doubt that Jensen cruelly planned and plotted and, in fact, carried out the murder of his wife Julie—*we move on to examine the admitted testimonial evidence for a determination as to whether the assumed error in admitting it was harmless or reversible.* As already noted, we conclude that the State has met its burden of proving admission of the testimonial evidence was harmless beyond a reasonable doubt. The State deftly dissects the challenged testimonial evidence

> and is able to point to admissible duplicative and corroborative evidence in the record.

*Id.* at 494–95 (emphasis added). This passage makes clear that while the Wisconsin Court of Appeals found the nontestimonial evidence against Jensen sufficient to support the jury's verdict, this was not the basis of its harmlessness finding. Instead, the court "move[d] on" to conclude that the admission of Julie's testimonial statements was harmless because the statements were duplicative of other, untainted corroborative evidence. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) ("Whether such an error is harmless in a particular case depends upon a host of factors…. These factors include … whether the testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points…."). As the Wisconsin court stated in concluding its harmlessness analysis, "[t]he sine qua non is that the testimonial statements provided nothing significant beyond the properly admitted nontestimonial statements." *Jensen II*, 794 N.W.2d at 499. And as the court reiterated in concluding its opinion: "the State has proven beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained." *Id.* at 504; *cf. Chapman*, 386 U.S. at 24 ("[B]efore a federal constitutional error can be held harmless [on direct appeal], the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

The Wisconsin Court of Appeals concluded that "even assuming the testimonial evidence of Julie's letter and Julie's statements to Kosman were inadmissible under the rules of evidence and the Sixth Amendment Confrontation Clause, we deem any error in admission harmless." *Jensen II*, 794

N.W.2d at 499. Based on the duplicative nature of Julie's testimonial statements and the overall strength of the prosecution's case (even considering the defense evidence discussed by the majority), I am not convinced that the state court's decision "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Ayala*, 135 S.Ct. at 2199 (quoting *Richter*, 562 U.S. at 103); *cf. id*. at 2198 ("There must be more than a 'reasonable possibility' that the error was harmful. The *Brecht* standard reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'") (quoting *Brecht*, 507 U.S. at 637; *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)). I would find that the decision of the Wisconsin Court of Appeals represented a reasonable application of controlling precedent. Accordingly, I would reverse the grant of habeas relief.